IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 6, 2008

## STATE OF TENNESSEE v. TRUMAINE WINTERS

**Appeal from the Criminal Court for Shelby County**
**No. 04-04042    James M. Lammey, Jr., Judge**

---

**No. W2007-00529-CCA-R3-CD  - Filed July 24, 2008**

---

The Appellant, Trumaine Winters, appeals his convictions and the resulting sentencing decisions of the Shelby County Criminal Court. After a jury trial, Winters was found guilty of first degree murder and aggravated robbery. Winters was sentenced to consecutive sentences of life imprisonment for first degree murder and twelve years for aggravated robbery. On appeal, Winters argues: (1) that the evidence was legally insufficient to sustain his convictions; (2) that the trial court "erred in failing to suppress the identification and subsequent identification testimony of State's witnesses"; (3) that the trial court erred in its application of enhancement factors at sentencing for the conviction of aggravated robbery; and (4) that the trial court erred in imposing consecutive sentencing. After review, we conclude that issues (1), (2) and (4) are without merit. However, with regard to issue (3), we conclude, following plain error review, that Winters' sentence for aggravated robbery must be reversed in light of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), and the case remanded for resentencing.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part; Reversed and Remanded in Part**

DAVID G. HAYES, SR.J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Kevin E. Childress, Memphis, Tennessee, for the Appellant, Trumaine Winters.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; Betsy Carnesale and Greg Gilbert, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

### Factual Background & Procedural History

On June 10, 2004, a Shelby County grand jury indicted the Appellant for one count of first degree murder, as defined by statute at Tennessee Code Annotated section 39-13-202(a)(2); and one

count of aggravated robbery, as defined by statute at Tennessee Code Annotated section 39-13-402.[1] The indictment alleged that the offenses were committed between January 18 and January 21, 2004. The Appellant was declared indigent and appointed counsel. He entered pleas of not guilty, and a jury trial was held on November 27-30, 2006.

The victim, Marcus Crawford, was twenty-eight years old when he was fatally shot during the course of an aggravated robbery in Shelby County. At trial, the State called eyewitness LaDonna Harris, who testified that on January 19, 2004, she resided in an apartment located at 268 Tillman in Memphis with her son and daughter and that the victim was her boyfriend. Ms. Harris recalled that shortly before midnight on January 19, the two children were in one bedroom of the apartment, and she and the victim were in the adjacent master bedroom when they heard a knock on the door. Mr. Crawford went into the living room to answer the door, and a few minutes later, Ms. Harris left the bedroom and walked down the hall to see Mr. Crawford talking to two men in the living room. Ms. Harris did not know the names of the two men at the time, but she recognized them from the neighborhood. On cross-examination, Ms. Harris testified that the two men had also visited her apartment that afternoon, after she arrived home from work, and that they inquired as to the whereabouts of Mr. Crawford. Ms. Harris described one of the men as "tall and skinny," and the other man as "short and dark-skinned." During her testimony, Ms. Harris identified the Appellant as the "tall and skinny" man. She stated that the Appellant wore a "gray hooded sweater with blue writing" during the robbery, and that the shorter man wore a "red hooded sweater." Ms. Harris testified that she saw the Appellant pointing a gun at Mr. Crawford's head, and that when the Appellant saw her enter the hallway, he ordered everyone to go back to the master bedroom. Ms. Harris and the victim went back to the bedroom as instructed, and the two men followed them.

Ms. Harris testified that, once they were all in the bedroom, the two men demanded money, and the shorter man pinned a struggling Ms. Harris behind the bedroom door "trying to smoosh [sic] [her]" while the Appellant pointed the gun at Mr. Crawford beside the bed. Harris told them that they did not have any money to give them, but that her purse was on the bed. The short man shook the purse and $80 in cash fell out, which he took and put in his pocket. Harris testified that the Appellant kept pointing the gun at the victim, and that the victim was turned so that his back was facing the Appellant. Harris testified that the Appellant then shot Mr. Crawford in the back. She recalled that "they tussled for a couple of minutes," during which time the gun went off again, leaving a bullet hole in her dresser. She stated that the men then dragged the victim out of the bedroom and into the living room. Ms. Harris stated that she heard the gun being fired again, and she later observed that a bullet had gone into the ceiling. Ms. Harris stated that the men then dragged the victim outside, and that she called 911. She heard the victim outside screaming for help, and she ran outside and saw the victim lying on the porch of an apartment across the street, where a family friend of the Appellant lived. The police arrived at the scene approximately fifteen minutes later. Ms. Harris testified that she identified the Appellant as the shooter after viewing a photographic lineup on January 23, 2004.

---

[1]The indictment also joined Reginald Shields as a co-defendant. Upon motion of the Appellant, the Appellant's trial was severed from that of Shields, who testified on behalf of the State in this case.

Audra Woods, the fifteen-year-old daughter of Ms. Harris, testified that she was eleven years old in January of 2004. She testified that she and her five year old half-brother, Marcus, Jr., who was the son of Ms. Harris and Mr. Crawford, were in their own bedroom the entire time that the two men were in the house on the evening of January 19, 2004. Miss Woods testified that she could see into the living room from the foot of her bed, and that she saw the Appellant holding a gun to the victim's head. Miss Woods testified that the gunman wore a gray hooded sweatshirt, and that the other man wore a red hooded sweatshirt. Miss Woods testified that she saw the two men and her mother and the victim go into the master bedroom, that she heard two gunshots, and that she grabbed her little brother and hid in the closet. She testified that she saw the men dragging the victim down the hallway, and that she heard another gunshot when the men were in the living room. Miss Woods stated that after the two men left the house, she went to the living room, looked out the screen door, and saw the men drag the victim across the street and leave him on the porch of an apartment. Miss Woods testified that she spoke with the 911 operator after her mother called to report the shooting and robbery. Miss Woods subsequently identified the Appellant as the man she saw holding a gun to the victim's head, after she viewed a photographic lineup on January 23, 2004.

Andrew Brown testified that he was an officer with the Memphis Police Department. Brown responded to the crime scene at approximately 11:35 p.m. He observed the victim lying on the porch of the apartment complex across the street from 268 Tillman, and he recalled that the victim had been shot once in the back. Officer Brown testified that based upon his own experience and the location of the gunshot wound, he thought Mr. Crawford was in imminent danger of death. He asked the victim who shot him, and the victim responded, "I don't know right now." Officer Brown tried to calm the victim until the ambulance arrived, and he later learned that the victim died.

Alfred Gardner lived next door to Ms. Harris and her children. He testified that the victim was present at the house periodically. On the night of January 19, 2004, he awoke to the sound of doors being slammed and looked out his window, which was "foggy" from the cold air outside. Gardner stated that he observed two men cross the street and get into the passenger side of a parked vehicle, which he described as a "small minivan." Gardner stated that "one of [the men] was a little taller than the other one." He testified that he saw the vehicle pull away, and that he saw Ms. Harris outside talking on the telephone.

John Hudson, who lived at the apartment in front of which the victim was found, testified that he was a longtime family friend of the victim. On the night of the shooting, he heard knocking at his door, and upon opening the door, saw the victim lying on the porch, bleeding. Hudson testified that the victim called him by his nickname, "Uncle J.R.," and said, "Call the ambulance. I've been shot." Hudson went inside the apartment and called 911. Hudson recalled noticing a cut on the victim's arm. Hudson stated that one of his neighbors provided the victim with a blanket for comfort while they waited for an ambulance.

Sergeant Barry Hanks of the Memphis Police Department testified that he was assigned to investigate the homicide. He visited the crime scene and spoke with Ms. Harris and her daughter regarding the circumstances of the crime and possible suspects in the case. Sergeant Hanks

assembled several photographic lineups of suspects. During her viewing of one of these lineups, Ms. Harris identified Reginald Shields as the man who held her against the bedroom wall and took money from her purse. Sergeant Hanks testified that he brought Shields in for questioning, and that Shields admitted he was present at the robbery, but that the Appellant was responsible for shooting the victim. Sergeant Hanks recalled that Shields "minimized his involvement" in the crimes but "knew how much money was taken out of [Ms. Harris's] purse," and that Shields claimed that a third man had been involved. Sergeant Hanks testified that he prepared another photographic lineup of suspects, which contained a photograph of the Appellant and five other individuals, and that on January 23, both Ms. Harris and her daughter identified the Appellant as the shooter from the photographic array.

At trial, Reginald Shields testified that he knew the Appellant from their having been "in and out of juvenile facilities together for about five [or] six years." Shields stated that on the date of the robbery and murder, he saw the Appellant with two other people in the neighborhood in a dark blue Ford Explorer. He recalled that the Appellant wore a gray hooded sweatshirt. Shields claimed that the Appellant informed him of his intentions to rob the victims, and that he "pulled a gun on [Shields]" and said Shields was "going to be the watchout." Shields testified that he walked with the Appellant and an unidentified third man, who allegedly wore a red sweatshirt, to Ms. Harris's residence, and that they knocked on the door. Shields stated that when the victim opened the door, the Appellant went into the residence with a gun, that the "third man" went in next, and that he was the last person to enter the residence. Shields said that while they stood in the living room, the Appellant put the gun in the victim's face and demanded marijuana. When the victim responded that he had no marijuana, the men searched the residence. Shields testified that the Appellant took the victim to the master bedroom while he remained in the living room. Shields stated that he heard two gunshots a few minutes later. Shields said that the other two men dragged the victim out of the bedroom, and that he helped them drag the victim to the apartment across the street. Shields testified that he overheard the Appellant and the "other guy" say they had stolen $80 and "a pound of weed."

Officer David Payment testified that he worked with the Crime Scene Investigation unit of the Memphis Police Department, and he described the bullet damage and bloodstains he observed inside Ms. Harris' residence, photographs of which were admitted into evidence. The State concluded its case with the testimony of Dr. O.C. Smith, who was the medical examiner in Shelby County until February of 2004, and who was admitted by the trial court as an expert in the field of forensic pathology. Dr. Smith testified that he performed the autopsy on the victim, Mr. Crawford. Dr. Smith opined that the victim's death was a homicide, caused by a gunshot wound to the back and resulting internal bleeding. Dr. Smith stated that powder burns on the victim indicated that the muzzle of the gun was within two feet from the victim at the time it was fired. Dr. Smith related that the bullet, which he believed to be between a .22 and .45 caliber in size, entered the victim's back, traveled toward his front and downward, causing injuries to his lung, diaphragm, pancreas, and small intestine, and that he found the bullet in the victim's abdominal cavity. Dr. Smith further testified that the victim had another wound to his left forearm, caused by something with a sharp edge, such as metal or glass.

The defense called Sergeant Ernestine Davidson of the Memphis Police Department as a witness. Sergeant Davidson stated that, at approximately 2:00 a.m. in the early morning after the murder and robbery, Ms. Harris initially did not want to come to the homicide bureau and talk to the police, but that she did come to the police station a few hours later that morning. Lieutenant William Woodard, also of the Memphis Police Department, testified that he received a phone call from Ms. Harris on the afternoon after the crimes were committed, and that Ms. Harris told him that a man named "Tony" was responsible for the shooting. Lieutenant Woodard stated that it was his impression that Ms. Harris had received this information by speaking with people in her neighborhood. Lieutenant Woodard testified that he learned that the name "Tony" might have been associated with Reginald Shields, whose middle name he believed was "Antonio."

Based upon the foregoing evidence, the jury found the Appellant guilty of first degree felony murder and aggravated robbery. As provided by law, the Appellant received a sentence of life imprisonment for the first degree murder conviction. A sentencing hearing was held with regard to the aggravated robbery conviction, and the Appellant was ordered to serve a term of twelve years in the Department of Correction, as a Range I, standard offender, to run consecutively to the life sentence. The Appellant filed a motion for new trial, which was denied by the trial court. The Appellant timely filed a notice of appeal.

## Analysis

### I. Sufficiency of the Evidence

The Appellant argues that the evidence at trial was legally insufficient to support his convictions for aggravated robbery and first degree felony murder. He alleges numerous inconsistencies in the eyewitness testimony of both Ms. Harris and her daughter at trial in support of his position. The Appellant concedes that "the question of identity is traditionally held to be a matter of fact" for determination by the jury, however, he submits that "the eyewitness testimony presented by the State is inherently untrustworthy."

The Appellant argues that Ms. Harris's description at trial of the gunman's clothing as being a gray hooded sweatshirt, with blue writing, was inconsistent with her testimony at a preliminary hearing that the sweatshirt was blue, with gray writing. He also questions Ms. Harris' description of the gunman as "tall and skinny[,]" citing the testimony of her neighbor Gardner, who described the suspects as being "about five [foot] something" in height. The Appellant further argues that Ms. Harris' and Miss Woods' testimony that they saw the assailants dragging the victim across the street was inconsistent with Garner's recollection that he did not see the suspects dragging a person when he looked out his window. The Appellant further questions Ms. Harris' "vague" testimony as to when she believed she had seen the suspects previously in the neighborhood, as it varied from a number of months, to "a couple of weeks," to the afternoon of January 19. The Appellant cites Ms. Harris' initial statement to police, that she believed a man named "Tony" was responsible for the murder, in challenging her identification of the Appellant as the gunman. As to Miss Woods, who also identified the Appellant as the gunman, he argues that her testimony that she observed him, from

her bedroom, in the living room holding a gun to the victim's head is contradicted by Officer Payment's testimony that it would have been difficult to see from the children's bedroom into the living room. The Appellant further argues that Miss Woods' testimony that she "peek[ed] around the corner" and looked into "a little crack" in the door to the master bedroom and observed the crimes taking place was inconsistent with Ms. Harris' testimony that the master bedroom door was open. The Appellant argues that the testimony of Reginald Shields identifying the Appellant as the shooter is contradicted by his writing the name "Termaine," rather than his actual name of "Trumaine," on the picture of the Appellant shown to Shields by police during a photographic lineup. The Appellant also argues that Shields' testimony describing events taking place within the master bedroom were inconsistent with his testimony that he stayed in the living room, while the Appellant and the alleged third assailant took the victims into the bedroom.

In our review of the issue of sufficiency of the evidence, the relevant question is "whether, after viewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as triers of fact. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1994). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. *State v. Philpott*, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn. 1978)).

Aggravated robbery is statutorily defined as robbery accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon, or where the victim suffers serious bodily injury. T.C.A. § 39-13-402(a) (2003). The offense of first degree murder, as charged by the indictment in this case, is defined by statute as a killing of another committed in the perpetration of or attempt to perpetrate the crime of robbery. T.C.A. § 39-13-202(a)(2) (2003).

Upon thorough review of the record, we conclude that the evidence was more than sufficient to convince a rational juror beyond a reasonable doubt that the Appellant committed the crimes for which he was convicted. The Appellant's entire argument on this issue is, notably, premised upon an alleged lack of credibility as to eyewitnesses called by the prosecution in this case. We reiterate that the  weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as triers of fact. *Strickland*, 885 S.W.2d at 87. A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. *Id.* (citing *State v.*

*Williams*, 657 S.W.2d 405, 410 (Tenn. 1983)). Furthermore, it is well-established that the identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of all competent proof. *Strickland*, 885 S.W.2d at 87 (citing *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). The overwhelming proof presented at trial was legally sufficient to establish the State's theory that the Appellant participated in robbing the victims at gunpoint and fired the fatal gunshot into Mr. Crawford's back. Accordingly, this issue is without merit.

## II. Admissibility of Pretrial Identification and Identification Testimony

The Appellant next argues that the trial court erred in failing to suppress the identification and subsequent identification testimony of witnesses for the State. Before trial, the Appellant filed a motion to suppress Ms. Harris' and her daughter, Miss Woods,' pretrial identifications of the Appellant as the shooter of Mr. Crawford. An evidentiary hearing was held on the motion at which Sergeant Hanks and the two eyewitnesses provided testimony in this regard. In an effort to argue against the constitutionality of the trial court's admission of these eyewitnesses' pretrial identifications of the Appellant as the single gunman during the robbery and corresponding testimony at trial, the Appellant appears to reprise his previous arguments concerning the credibility of the prosecution eyewitnesses, submitting that the identifications were unreliable under the totality of the circumstances.[2]

The findings of fact made by the trial court at the hearing on a motion to suppress are binding on this court unless the evidence contained in the record preponderates against them. *State v. Reid*, 213 S.W.3d 792, 825 (Tenn. 2006) (citing *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001)). Absent a showing by the defendant that the evidence preponderates against the judgment of the trial court, this court must defer to the ruling of the trial court. *Reid*, 213 S.W.3d at 825 (citing *State v. Cribbs*, 967 S.W.2d 773, 795 (Tenn. 1998), *cert. denied*, 525 U.S. 932, 119 S. Ct. 343 (1998)).

The United States Supreme Court established a two-part test to assess the validity of a pretrial identification in *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S. Ct. 375, 382 (1972). Specifically, the court must determine (1) whether the procedure used to obtain the identification was unduly suggestive and (2) if the identification was unduly suggestive, the court must determine, under the totality of the circumstances, whether the identification is nevertheless reliable. *Id.* A finding that the pretrial identification was unreliable will also require the exclusion of a subsequent in-court identification by the same witness. *State v. Philpott*, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994).

At the hearing on the Appellant's motion to suppress, Sergeant Hanks testified that he interviewed Reginald Shields two or three days after the crimes were committed, and Shields identified the Appellant as the shooter of Mr. Crawford. Sergeant Hanks subsequently contacted Ms. Harris and asked her to come to the homicide office and view a "photo spread for identification."

---

[2] The Appellant's argument is actually framed , " . . . that said identification and subsequent testimony . . . [was] so suggestive as to give rise to a very substantial likelihood of irreparable misidentification." The Appellant then proceeds to challenge the credibility of the prosecution witnesses.

He described the preparation of a "photo spread," stating that he gathered "six photos of people like and similar in description . . . race, sex, age, physical characteristics[,]" and used a computer program to randomly place the photographs into position. He further described the standard procedure for preparing a witness to view a photo spread, which included giving them, and reading to the witness orally, a form advising the witness

> It explains that . . . they're going to look at a photo spread. It's going to contain people similar in description. Nobody is going to give them a hint as to . . . which position the possible suspect is. It explains that the photo spread may not even contain a suspect in . . . whatever the crime suspected is.

Sergeant Hanks testified that both Ms. Harris and Miss Woods appeared to understand these directions on the morning of January 23, 2004, approximately four days after the shooting, and that he did not suggest to them which photograph was of the Appellant. Sergeant Hanks testified that both witnesses identified the Appellant as the gunman. At the conclusion of the hearing, the trial court denied the Appellant's motion to suppress the identifications, stating that it saw "nothing unduly suggestive in the photo spreads" and that "they all appear similar in age and complexion."

Our review of the photo spread used in this case leads us to agree with the trial court's finding that the photographs were of men all very similar in appearance. We conclude that the evidence does not preponderate against the finding of the trial court that the photographic composite used by the police in this case was not unduly suggestive. Despite the Appellant's argument that the pretrial identifications were unreliable when viewed under the "totality of the circumstances," he has failed to cite precedent supporting the proposition that such an inquiry is required when the defense has failed to make a showing that the photo composite is unduly suggestive. To the contrary, our reflection upon Tennessee case law on this issue demonstrates that our courts have found it unnecessary to address the "totality of the circumstances" prong of the *Neal v. Biggers* test when it has been determined that the pretrial identification was not unduly suggestive. *See, e.g.*, *State v. Reid*, 213 S.W.3d 792, 825 (Tenn. 2006); *State v. Jose E. Molina*, No. M2005-01033-CCA-R3-CD (Tenn. Crim. App. at Nashville, July 25, 2006). The Appellant is not entitled to relief on this issue.

## III. Sentencing

The Appellant was sentenced to twelve years' imprisonment for the aggravated robbery conviction, the maximum sentence allowed for a Range I, standard offender convicted of a Class B felony. *See* T.C.A. § 40-35-112(a)(2) (2003). This sentence was ordered to run consecutively to the life sentence for first degree murder. The Appellant argues that the trial court erred in sentencing him to a term of twelve years for aggravated robbery. He further argues that the trial court erred by running this twelve-year sentence consecutively to the life sentence resulting from his conviction for first degree murder.

When an accused challenges the length, range, or the manner of service of a sentence, this court has a duty to conduct a *de novo* review of the sentence with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d) (2003); *State v. Ashby*,

823 S.W.2d 166, 169 (Tenn. 1991). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *Ashby*, 823 S.W.2d at 169.

### a. Application of Enhancement Factors

At sentencing, the trial court applied the following eight enhancement factors: (2) the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (3) the defendant was a leader in the commission of an offense involving two or more criminal actors; (4) the offense involved more than one victim; (6) the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; (7) the personal injuries inflicted upon or the amount of damage to property sustained by or taken by the victim was particularly great; (9) the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; (11) the defendant had no hesitation about committing a crime when the risk to human life was high; and (17) the crime was committed under circumstances under which the potential for bodily injury to a victim was great. *See* T.C.A. § 40-34-114 (2003). The trial court found no mitigating factors applicable.

The Appellant contends that the trial court erred in applying sentence enhancement factors (3), "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors[,]" and (6), "[t]he defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense[.]" The criminal conduct underlying the conviction at issue occurred on January 19, 2004, prior to our legislature's enactment of the 2005 Amendments to the Sentencing Act. The sentencing hearing in this case was conducted on January 26, 2007.[3] Before the sentencing hearing was held, the trial court provided the Appellant with the option of proceeding under the Sentencing Act as it existed when the offenses were committed, or as it was amended in 2005. The Appellant chose to be sentenced under the Sentencing Act as it existed at the time of the offenses.

At this juncture, we are constrained to note that although not raised by the Appellant at trial or on appeal, the record unequivocally demonstrates that the Appellant's sentence is constitutionally infirm under the holding of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004),[4] which applied the rule expressed in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000), that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and approved beyond a reasonable doubt." In adherence with the holding of *Blakely v. Washington*, our supreme court in *State v. Gomez*, 239 S.W.3d 733, 743 (Tenn. 2007) ("*Gomez II*"), concluded that this State's pre-

---

[3]In fairness to the trial court, at the time of the sentencing hearing in this case, *State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005) ("*Gomez I*"), was controlling case law. Our supreme court's decision in *State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007) ("*Gomez II*"), overruling *Gomez I*, was released on October 9, 2007.

[4]No waiver of a *Blakely* claim is included within the record before us.

2005 sentencing act violated Gomez's right to jury trial and that plain error review of a *Blakely* infraction was "necessary to do substantial justice." *See* Tenn. R. Crim. P. 52(b). Accordingly, we similarly conclude that based upon the application of seven constitutionally deficient enhancement factors, from a total of eight applied, substantial justice requires that the Appellant's twelve-year maximum sentence for aggravated robbery be vacated and remanded for a sentencing hearing consistent with the holding in *Gomez II*.

### b. Consecutive Sentencing

The Appellant further alleges error with the trial court's decision to run the twelve year sentence for aggravated robbery consecutively to the life sentence for first degree murder.

A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" § 40-35-115(b)(4) (2003). The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved" under the circumstances. T.C.A. § 40-35-102(1), -103(2) (2003). Additionally, whether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court. *State v. Hastings*, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999).

In *Gray*, our supreme court held that before consecutive sentencing could be imposed upon the finding of a defendant to be a dangerous offender, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses. *Gray v. State*, 538 S.W.2d 391, 393-94 (Tenn. 1976). In *State v. Wilkerson* and *State v. Imfeld*, our supreme court reaffirmed those principles, holding that before sentencing a defendant to serve consecutive sentences on the basis that he is a dangerous offender, the trial court must find that the resulting sentence is reasonably related to the severity of the crimes and necessary to protect the public against further criminal conduct. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002); *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995).

The trial court articulated its decision to impose consecutive sentencing as follows:

> [T]he defendant is a dangerous offender whose behavior indicates little or no hesitation about committing a crime in which the risk to human life is high. I find that that does apply and because the circumstances surrounding the commission of the offense are aggravated, certainly aggravated. And that the confinement for an extended period of time is necessary to protect society from the defendant's . . . [unwillingness] to lead a productive life and the defendant's resort to criminal activity in furtherance of an antisocial lifestyle, I think he's the poster boy for that,

I would say. And that the aggregate length of the sentence reasonably relate[s] to the offense [for] which the defendant stands convicted. I find all those apply.

The Appellant argues that "the trial court erred in finding that the circumstances surrounding the commission of the offense were aggravated . . . as the court failed to set out any findings of fact pertaining thereto as mandated in Gray." He asserts that "as no evidence was presented and the trial court failed to find a factual basis for aggravated circumstances, consecutive sentencing was improper." We disagree. Reviewing the decision *de novo*, we recognize that the record contains ample evidence that the crimes committed in this case were surrounded by aggravating circumstances. After ordering Mr. Crawford and Ms. Harris into a bedroom and demanding money and marijuana from them at gunpoint, the Appellant obtained cash from the purse of Ms. Harris, and shot Mr. Crawford in the back at close range. After a struggle with the victim in which another shot was fired in the bedroom, the Appellant participated in dragging Mr. Crawford into the living room of the residence, where he fired another gunshot, which further endangered the lives of Ms. Harris and her two children, who were in nearby bedrooms of the residence. The Appellant subsequently dragged the seriously wounded victim across the street to the porch of another apartment. As the trial court properly found the factors necessary to impose consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(4) and *Gray* and its progeny, we affirm the trial court's decision to impose consecutive sentencing in this case. Accordingly, the Appellant is not entitled to relief on this issue.

## CONCLUSION

Based upon the foregoing, the judgments of conviction for the crimes of first degree murder and aggravated robbery are affirmed. Moreover, the trial court's imposition of consecutive sentences is affirmed. The Appellant's sentence for aggravated robbery is reversed and vacated, and the case is remanded for a sentencing hearing consistent with this opinion.

_____
DAVID G. HAYES, SENIOR JUDGE